United States Court of Appeals,

Fifth Circuit.

No. 93-3500.

MAC SALES, INC., et al., Plaintiffs,

Kenneth P. Choina, Sr., Plaintiff-Appellant,

v.

E.I. du PONT de NEMOURS & COMPANY, Defendant-Appellee.

July 5, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before POLITZ, Chief Judge, DAVIS and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Louisiana Civil Code article 2054 provides that "law, equity, or usage" are presumed to furnish the contractual terms when a contract is silent as to a particular situation. In the instant case, Defendant-Appellee E.I. du Pont de Nemours & Company ("du Pont") claimed—and the district court agreed—that under article 2054 Plaintiff-Appellant Kenneth Choina's ability to choose a garment fabricator should be restricted to those approved by du Pont as an implied term in du Pont's contract with Choina, which contract was silent on the matter. As we conclude that du Pont has failed to establish either that such a restriction is mandated by law or equity, or that it qualifies as a "usage" within the intendment of article 2054, we reverse and remand on this one issue. In all other respects, however, the judgment of the district court is affirmed.

I

1

FACTS AND PROCEEDINGS

In the early 1980's, Choina was employed in product development by CPR Industries ("CPR"). He discovered that one of CPR's clients was interested in light-weight fire-resistant protective coveralls for use in welding. Choina contacted du Pont, a maker of fire-resistant fabrics including Nomex Woven, a fairly heavy fabric used in coveralls, and Nomex Spunlaced, a far lighter and less expensive, though less durable, fabric. Du Pont had successfully developed a market for Nomex Woven but had failed to do so for Spunlaced products. Choina was already buying—for CPR—du Pont-developed materials from a garment fabricator (referred to in the trade as a "cutter"). He directed that fabricator to make up some sample Spunlaced coveralls, then began to work with du Pont's marketing and technical personnel to develop potential markets for this Spunlaced product.

In 1985, Choina left CPR and began doing business as Mac Sales.[1] Concerned that the cutters might usurp his market by selling garments directly to end-users, Choina sought exclusive rights from du Pont to market protective wear made from Spunlaced fabric. In May 1987, Choina received this authority by way of a letter from du Pont, which granted him the right to acquire "on an exclusive basis through December 1988, the ... spunlaced aramid for

---

[1]In the complaint and in the style of this case, MAC Sales is shown as being an incorporated entity. During trial Choina acknowledged, however, that MAC Sales was his unincorporated sole proprietorship. As neither party attaches significance to or contests this matter, we do not address it further. For convenience only, we refer to Choina as the relevant actor throughout this opinion.

2

use in limited wear protective apparel applications...." In reliance on that contract, Choina hired four salesmen and began to market the product.

Three operational problems arose shortly after the confection of this letter agreement, which is totally silent as to each of the three problem areas. The first such problem related to du Pont's assertion that Choina could only choose a cutter approved by du Pont. The cutter restriction became an issue as a result of raw material modifications by du Pont. These modifications led the cutter originally chosen by Choina to raise the cost of fabricating Spunlaced coveralls significantly, which in turn effectively lowered the price spread between Nomex Spunlaced garments and the more durable Nomex Woven garments, thereby reducing Choina's competitive advantage. When Choina attempted to protect his price advantage by switching to a lower-cost cutter, du Pont nixed the deal, claiming that Spunlaced products could safely be fabricated only by du Pont-approved cutters.[2] Although Choina continued to insist that he had a contractual right to use the cutter of his choice, du Pont as the sole manufacturer of Spunlaced fabric had de facto control over access to that fabric. Hence, Choina had no choice but to continue to use du Pont-approved cutters if he wished to obtain and market Spunlaced garments.

The second problem implicated the geographic limits of

---

[2]As du Pont points out, if a cutter made an error in fabrication—such as by using regular, non fire-resistant thread to stitch together a garment—then the garment might fail when used. Such failure would, of course, expose the wearer to danger.

3

Choina's exclusive contract. Choina attempted to market Spunlaced products to, inter alia, a contact in Japan. This contact, however, questioned Choina's claim of having the exclusive rights to market such products world-wide, including in Japan. When Choina sought to have du Pont verify that he had such rights, he was informed by du Pont that his exclusive rights were limited to the United States.

The third problem concerned purported disparagement of Choina's products by du Pont personnel. As Choina had limited technical knowledge about the Spunlaced protective garments, he referred all of his customers' technical questions to du Pont. Choina claims that when such calls were received by du Pont's employees, they disparaged the durability and effectiveness of his product.

Choina sued du Pont, claiming breach of contract for this disparagement as well as for du Pont's efforts to impose geographic limitations and cutter restrictions, neither of which were mentioned in or alluded to in the agreement. First, the district court granted judgment as a matter of law for Choina on the issue of geographic limitations, but found that Choina had failed to prove damages resulting from du Pont's assertion of such limits. Next, the court granted judgment as a matter of law for du Pont on the issue of cutter restrictions, relying on Louisiana Civil Code article 2054 to conclude that this restriction should be implied from "law, equity, or usage." After thus ruling on the geographic limits of the agreement and the implied cutter restriction, the

4

court submitted the disparagement claim to the jury, which rendered a verdict for du Pont.  Choina timely appealed.

II

DISCUSSION

A. *Implied Restriction on Cutters*

Du Pont interprets its contract with Choina to require Choina to use only du Pont-approved cutters to fabricate Spunlaced garments.  The district court agreed and entered judgment as a matter of law for du Pont on this issue.  We review a district court's interpretation of a contract *de novo.*[3]

The starting point in contractual interpretation is the language of the contract itself.[4]  Here, the contractual language provides no support for du Pont's position.  Specifically, the operative language of the contract between Choina and du Pont is set forth in a letter agreement, which provides that:

> Du pont has agreed to provide you on an exclusive basis through December 1988 the heavier weight 4 oz./sq. yd. E-89 spunlaced aramid for use in limited wear protective apparel applications ...

Although this contract is absolutely silent as to any restrictions on how and by whom Choina's garments may be fabricated, du Pont nonetheless relies on Louisiana Civil Code article 2054—as did the district court—for the proposition that

---

[3]*E.g., American Totalisator Inc. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir.1993);  *USX Corp. v. Champlin,* 992 F.2d 1380, 1384 (5th Cir.1993).

[4]*See* LA.CIV.CODE ANN. art. 2046 (providing "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent").

such a restriction must be implied from "law, equity, or usage." Article 2054 provides that:

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.[5]

Initially, we observe that the restriction on cutters was an incidental, not a necessary, term of this contract. Simply put, this restriction was not essential to give effect to du Pont's grant of exclusive marketing rights to Choina.[6] Thus, this is not the type of contractual term—such as price—that had to be added so that Choina and du Pont would have a functional contract. Rather, the issue presented here is whether such a restriction should be added to this contract, or, to use the words of the Civil Code, whether such a restriction ought to be "regard[ed] as implied" from "law, equity, or usage."

Du Pont has not shown how "law, equity, or usage" justify incorporation of this restriction. Du Pont points to no "law"—and we know of none—that would require Choina's choice of cutters to be limited to those approved by du Pont. An appeal to "equity" by du Pont fares no better. Du Pont drafted this contract and was

---

[5]LA.CIV.CODE ANN. art. 2054.

[6]Acceptance of du Pont's reformulation of purpose as the marketing of "safe" fire-resistant protective wear would not change this result. In sum, even if using only du Pont-approved cutters was helpful in ensuring the fabrication of safe garments, it certainly was not *necessary* to achieving that purpose. To give just one obvious example, du Pont could have provided Choina with technical specifications so that he could have checked the quality of the fabricated garments.

certainly in a position to have its wishes regarding any restriction on cutters expressed in the written agreement. Instead, the contract itself explicitly provides that "[d]u Pont has agreed to provide you" (Choina) with the Spunlaced fabric.

Such contractual language offered Choina no clue that he could obtain garments fabricated from Spunlaced fabric only from cutters approved by du Pont. Indeed, Choina's awareness of this practice—if he was aware at all[7]—could come only from his previous dealings with du Pont as buyer for CPR and later as owner of MAC Sales. But even if Choina had such knowledge, neither Choina nor du Pont had a reasonable expectation that the multifarious terms of those various dealings—including the cutter restriction—were incorporated *sub silentio* into his contract with du Pont. Accordingly, we conclude that, under these circumstances, our "regretting" du Pont's invitation to insert a cutter restriction into the agreement in the face of contractual silence would not be inequitable; that is, it would not work an "unfair advantage" in favor of Choina.[8]

Finally, du Pont failed totally to adduce evidence that its cutter restriction represented a "usage." "Usage" is defined in the Civil Code as "a practice regularly observed in affairs ...

---

[7]Du Pont and Choina hotly contest whether Choina knew that du Pont distributed Spunlaced fabric only through approved cutters.

[8]*See* LA.CIV.CODE ANN. art. 2055 (defining "equity" in terms of preventing one contracting party from having an "unfair advantage" over another).

similar to the object" of the contract at issue.[9]  The appropriate reference for determining whether a practice is "regularly observed" is the industry or trade involved.[10]  Here, the only evidence offered by du Pont is that du Pont—not the entire industry or trade—unilaterally required that all protective wear garments be fabricated by an approved cutter.[11]  We conclude that this evidence is insufficient in itself to show that a "usage" existed in the relevant industry or trade.[12]

Du Pont has failed to establish that "law, equity, or usage"

---

[9]LA.CIV.CODE ANN. art. 2055.

[10]*See, e.g., Foods & Services, Inc. v. SHRM Catering Services, Inc.,* 486 So.2d 290, 292 (La.App. 3d Cir.1986) (looking to practices in the offshore catering industry to determine whether a discount from "actual cost" to "actual value" applied); *Fontenot's Rice Drier, Inc. v. Farmers Rice Milling Co.,* 329 So.2d 494, 499 (La.App. 3d Cir.) (looking to practices in the rice industry to determine when buyer had to notify seller of alleged deficiencies in purchased rice), *cert. denied,* 333 So.2d 239 (La.1976);  *Baton Rouge Sash & Door Co. v. Saale,* 298 So.2d 115, 116-18 (La.App. 1st Cir.1974) (looking to practices in the construction industry to determine whether prices quoted for millwork implicitly included sales tax).

[11]These facts suggest that this practice may have been part of a prior "course of dealing" between Choina and du Pont.  But a "course of dealing"—while possibly relevant to equitable considerations—does not provide a separate and independent basis for adding a contractual term when a contract is silent.  *See* LA.CIV.CODE ANN. art. 2054 (providing that "law, equity, or usage" may be used to supply terms when a contract is *silent* ); LA.CIV.CODE ANN. art. 2053 (providing that *doubtful* provisions of the contract should be interpreted in light of, inter alia, the course of dealings between the parties).  Obviously, the concept of total *silence* eschews the existence of a contractual provision, doubtful or otherwise.

[12]*See, e.g., Foods & Services,* 486 So.2d at 292 (uncorroborated testimony by seller of practice in industry insufficient to establish a custom or usage);  *Baton Rouge Sash & Door,* 298 So.2d at 118 (same).

support insinuation of a term restricting Choina's ability to chose cutters to only those approved by du Pont. We thus reverse and remand so that Choina may have an opportunity to prove the quantum of damages, if any, he suffered from du Pont's unjustified imposition of such a restriction.

B. *Geographic Limits and Damages*

When queried by Choina, Du Pont responded that his exclusive contract extended only to the United States. The district court ruled on this geographic limitation—as we have ruled on the cutter restriction—that du Pont was unjustified in insisting on such a limitation and in so doing breached the contract. Du Pont does not contest that ruling on appeal. Additionally, however, the court ruled that du Pont was not liable for damages, concluding that the expert testimony on damages adduced by Choina was inadmissible for lack of a proper foundation, and that Choina had failed to introduce any other legally sufficient evidence of damages resulting from du Pont's improper geographic restriction of Choina's rights.

In the exercise of its discretion a district court may exclude expert testimony that lacks an adequate foundation.[13] Here, the report of the expert, Dr. Elstrott, flatly states that he did no research on foreign markets:

> Addressed in this valuation were the domestic market segments outlined in Section IV. Several markets were not addressed in this report, among them is the international fire-resistant

---

[13]*See, e.g., Brown v. Parker-Hannifin Corp.,* 919 F.2d 308, 311 (5th Cir.1990); *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir.1987).

apparel market. Because of the limited amount of information available, no itemized market information could be presented in a reliable fashion. And so, to maintain this report's conservative posture, it was decided that only the domestic market should be addressed.

At deposition, Dr. Elstrott reiterated that he had only analyzed the domestic market. We cannot say that the district court abused its discretion in concluding that Dr. Elstrott lacked a proper foundation from which to testify on foreign markets.

Neither did the district court err in concluding that Choina's other evidence of damages arising from the improperly imposed geographic limitation was legally insufficient. Louisiana law is well-settled that lost profits "must be proven with reasonable certainty and cannot be based on conjecture and speculation."[14] Here, the only evidence Choina offered regarding damages was that he communicated with one party in Japan—who inquired *inter alia* about the nature of the product and about Choina's exclusive rights—and that he sent a letter to another party in Australia, who never responded. Choina acknowledged that both of these solicitations were "cold calls" and that he never followed up to ascertain why they did not result in sales. Of course, such evidence could suggest many things, ranging from lack of interest in the Spunlaced product to an aversion to dealing with unknown distributors. Only speculation or conjecture could tie such evidence of lack of foreign sales to du Pont's efforts to

---

[14]*Guy T. Williams Realty, Inc. v. Shamrock Constr. Co.,* 564 So.2d 689, 695 (La.App. 5th Cir.1990), *cert. denied,* 569 So.2d 982 (La.1990); *see also, e.g., Guidry & Swayne v. Miller,* 47 So.2d 721, 723 (La.1950) (same); *Folds v. Red Arrow Towbar Sales Co.,* 378 So.2d 1054, 1059 (La.App. 2d Cir.1979) (same).

limit Choina's exclusive rights to this country.  Thus, as the district court correctly concluded, this evidence was legally insufficient to create a fact issue for the jury.[15]

C. *Product Disparagement*

The jury found that du Pont did not disparage Choina's products.  Choina moved for a new trial on this issue, which the district court denied.[16]  As Choina concedes, we review such denials under a highly deferential standard of review, reversing only if the district court abused its broad discretion in concluding that the verdict was not against the great weight of the evidence.[17]

Here, the evidence was at most inconclusive.  Du Pont employees testified that no disparagement took place and that they merely offered objective, neutral information on the proper applications for Spunlaced products.  Du Pont also pointed out that it had much to gain if Choina had been able to develop a market niche for Spunlaced products, so that disparagement would be against du Pont's own interests.  Choina did not rebut this

---

[15]*See* FED.R.CIV.P. 50(a)(1) (providing that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue, the court may ... grant a judgment as a matter of law").

[16]Choina also moved for judgment as a matter of law on this issue.  As Choina fails to satisfy the lesser standard for new trials, *a fortiori* this claim must fail.

[17]*E.g., Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir.1982) (observing that "[w]hen the trial judge has refused to disturb a jury verdict, all of the factors that govern our review of his decision favor affirmance");  *see also, e.g., Pagan v. Shoney's Inc.,* 931 F.2d 334, 336-37 (5th Cir.1991) (same).

testimony with concrete instances of disparagement. Instead Choina—who conceded that he had no technical knowledge regarding fire-resistant safety wear—simply argued that du Pont's views as to proper use constituted disparagement. He tried to couple this argument with a "conspiracy" inference, that somehow du Pont wanted him out of the market, even though he offered no evidence other than lack of sales for this inference, and even though such an inference makes little sense in light of du Pont's uncontested statements of its own profit motivations.

From the foregoing, it is clear that the jury's verdict was not against the great weight of the evidence. Accordingly, the district court did not abuse its discretion in refusing to grant a new trial on the disparagement issue.

### III

### CONCLUSION

Choina and du Pont entered into a skeletal exclusive distributorship agreement which left unaddressed any number of essential and nonessential terms and conditions. As often happens in such circumstances, problems arose between the parties when they reached the performance stage of this contract. And, as too often happens, such problems produced "a federal case."

Concluding that the district court erred in entering judgment as a matter of law for du Pont on the "cutter" issue, we REVERSE and REMAND that part of the court's judgment so that a jury may have the opportunity to determine whether Choina suffered any damage from the unjustified imposition of such a restriction by du

12

Pont, and, if so, in what amount.  The remainder of the judgment of the district court is, however,

AFFIRMED.